UNITED STATES DISTRICT COURT
DISTRICT OF MAINE\

RONALD E. TILLEY,                         )
                                          )
Plaintiff,                                )
                                          )
v.                                        )          1:10-cv-00066-JAW
                                          )
CANDIS KEEFER., *et al.*,                 )
                                          )
Defendants                                )

**RECOMMENDED DECISION ON
DEFENDANTS' DISPOSITIVE MOTIONS
(Doc. Nos. 85, 87& 89)
AND PLAINTIFF'S MOTION TO DISMISS WITHOUT PREJUDICE
(Doc. No. 103)**

**ORDERS ON
PLAINTIFF'S MOTIONS TO SHOW CAUSE (Doc. No. 99) MOTION TO STAY (Doc.
No. 90), CITY DEFENDANTS' OBJECTION TO CORRESPONDANCE REQUESTING
AN EVIDENTIARY HEARING (Doc. No. 106) and PLAINTIFF'S RENEWED MOTION
FOR AN EVIDENTIARY HEARING, SEEKING APPOINTMENT OF COUNSEL, and
WITHDRAWING THE MOTION TO DISMISS (Doc. No. 107).**

Ronald Tilley brought this civil rights complaint to seek redress for what he characterizes

as an illegal search and seizure at his residence which contributed to his current incarceration in

the Maine State Prison. Tilley was on probation for assault and tampering with a witness

convictions[1] when he was visited by two probation officers at 10:30 p.m. on July 22, 2008.

There was a relatively recently issued protection order standing against Tilley forbidding him

from having contact with a certain teenage girl, a relationship that is apparently unconnected

with the charges on which he was placed on probation.   During the visit the officers noted that

---

[1]        This is not an exclusive list of his convictions at this time but making a full accounting of the charges he
was facing in the state proceeding at this juncture is not relevant to the disposition of this civil rights action.

Tilley had a second cell phone; this was a phone that he never notified his supervising officer he obtained in contravention of inquiries made to him by his supervising officer. It was also a condition of his probation, needless to say, that Tilley not commit new violations of law. This second cell phone was inspected by the officers and they determined that Tilley had had a significant amount of contact with the minor girl named in the protection order. In this civil suit Tilley seeks remedy on constitutional[2] and state tort law claims.

There are a host of motions pending in this case. The most recent dispositive motion in this litigation is one filed by Tilley seeking dismissal of his complaint without prejudice. With some defendants resisting this request, on December 14, 2010, the court received a letter from Tilley indicating that he wanted to withdraw his motion because, in essence, he did not want the dismissal to be with prejudice.[3]

Tilley is still involved in a post-conviction proceeding in the Maine superior court and the parties perceive a significant concern regarding his ability to pursue a civil action while he remains convicted of the underlying offense in light of Heck v. Humphrey, 512 U.S. 477 (1994). This request of dismissal without prejudice by Tilley, the instigator of the suit, would be the simplest means of egress for the court but not for the defendants who have devoted significant effort and time in responding to Tilley's complaint and advancing -- though a contentious discovery period -- to the stage of being able to present dispositive motions for judgment.

---

[2]    Tilley's claims under the Maine State Constitution and the United States Constitution rise or fall on the same legal standard. See Estate of Bennett v. Wainwright, 548 F.3d 155, 179 (1st Cir. 2008) ("[T]he protections provided by the Maine Civil Rights Act, including immunities, are coextensive with those afforded by 42 U.S.C. § 1983."). It is not clear to me how this precedent advances Tilley's theory of the case.

[3]    On December 14, 2010, Tilley filed a letter motion which was directed at several issues arising in this case. In this missive Tilley indicates that he wishes to withdraw his motion to dismiss without prejudice. (Doc. No. 107, Page ID 576.)

There are three clusters of defendants in this action. The Maine Department of Probation and Parole moves for dismissal on the grounds that it is protected by the doctrine of sovereign immunity on the federal and state constitutional claims and discretionary function immunity on the state tort claims. (Doc No. 89.) Defendants Kiefer[4] and Legassie[5] move for summary judgment (Doc. No. 87), as have the Bangor Police Department, the City of Bangor, and Officer Doug Smith (Doc. No. 85).[6]

I now recommend denying Tilley's motion to dismiss without prejudice. I further recommend that the Court grant judgment in favor of the defendants on their three dispositive motions. I deny Tilley's motions to stay, to show cause, for appointment of counsel, and his requests for an evidentiary hearing.

## DISCUSSION

### Maine Department of Probation and Parole (Doc. No. 89)

In the motion to dismiss filed on behalf of the Maine Department of Probation and Parole, the defendant argues that it is entitled to judgment on the grounds of sovereign immunity on Tilley's constitutional claims and discretionary function immunity on Tilley's state law claims. In his response Tilley makes it clear that he is seeking to hold the department liable on a theory of supervisory liability for the failure to act when its officers exceeded the scope of their official authority. (Resp. at 2.) He maintains that the department was given notice of violations

---

[4]     Tilley spells this defendant's last name "Keefer" and that is the way it was entered on the docket. However, it appears from the pleading filed on his behalf that the correct spelling is "Kiefer" and that is the name I use in this recommended decision.

[5]     Tilley spells this defendant's last name "Laggasse" and that is the way it was entered on the docket. However, it appears from the pleading filed on his behalf that the correct spelling is "Legassie" and that is the name I use in this recommended decision.

[6]     In his response Tilley makes it clear that he is not invoking a Fourteenth Amendment "shocks the conscience" theory of recovery. (Resp. at 5.) His citation to the Fourteenth Amendment seems to be purely a matter of making the Fourth Amendment interests invoked applicable to state (as opposed to federal) actors.

of civil rights by its employees necessitating agency action, relying on his complaints to the department. (Id. at 2-3.)  He states that the officers in his case were operating under a belief that Tilley had conceded to a blanket waiver of his right to be free from warrantless searches as a probationer and stresses that the officers did not have reasonable suspicion to conduct the search for probationary goals. (Id. at 2.)  He describes the search as a "clear abuse of power and subterfuge."  (Id.) He sets forth a deliberate indifference standard for supervisory liability. (Id. at 3.)  With respect to the defendant's argument concerning sovereign immunity Tilley stresses that he is seeking injunctive relief.  (Pl.'s No. 9, 2010 Obj. at 7, Doc. No. 95, Page ID No. 527.)

"States and their agencies are entitled to sovereign immunity "regardless of the relief sought." Poirier v. Mass. Dept. of Corr., 558 F.3d 92, 97 (1st Cir. 2009) (quoting Kentucky v. Graham, 473 U.S. 159, 167 n. 14 (1985)).  See also id.  ("Poirier's argument that she only seeks prospective injunctive relief against the DOC is therefore unavailing."); see generally Will v. Mich. Dep't. of State Police, 491 U.S. 58 (1989); Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 99 (1st Cir.2002).  Therefore the department is immune from suit on Tilley's constitutional claims.  With regards to Tilley's claim under the Maine Torts Claims Act, the department has invoked 15 M.R.S. § 8103 discretionary immunity and argues that the statutory waivers of this immunity do not apply to Tilley's claims.   I agree.  See Maynard v. Comm'r of Corr., 681 A.2d 19, 23 (Me. 1996) (" Pursuant to the Maine Tort Claims Act, governmental entities are immune from suit, subject to specific, limited exceptions. 14 M.R.S.A. § 8103(1); Webb v. Haas, 665 A.2d 1005, 1011 (Me.1995)."); Pew v. Scopino, 904 F.Supp. 18, 33 (D. Me. 1995) ("To the extent that the tort claims … against the state supervisors are to be construed as claims against the State of Maine, the state is entitled to immunity under section 8103 of the

Maine Tort Claims Act. The plaintiffs have made no argument that any of the exceptions to the state's immunity apply here.").[7] The Department's motion to dismiss should be granted.

## Summary Judgment Standard

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movants are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56 (a),(c). I draw all reasonable inferences in favor of Tilley, but where he bears the burden of proof, he "'must present definite, competent evidence' from which a reasonable jury could find in [his] favor." United States v. Union Bank For Sav. & Inv. (Jordan), 487 F.3d 8, 17 (1st Cir. 2007) (quoting United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992)).

Tilley has not presented any evidence in defense of the motion for summary judgment in a format in conformance with District of Maine Local Rule 56. However, this court,

> may not automatically grant a motion for summary judgment simply because the opposing party failed to comply with a local rule requiring a response within a certain number of days. Rather, the court must determine whether summary judgment is "appropriate," which means that it must assure itself that the moving party's submission shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Advisory Committee Note to Rule 56 ("Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.").

NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7 -8 (1st Cir. 2002). Tilley has filed an affidavit and a statement of allegations in response to the dispositive motions. (See Page IDs. Nos. 533-

---

[7]    In a footnote this defendant also argues that it would be entitled to a Federal Rule of Civil Procedure 12(b)(6) dismissal for failure to state a claim because the fact that Tilley notified the department of his claims of alleged misfeasance by Officers Kiefer and Legassie after the fact would be insufficient to hold it liable for pre-notification conduct.  See cf. Marino v. Commissioner, 1:08-cv-00326 –GZS, 2010 WL 2732008, 8 (D. Me. June 30, 2010) (recommended decision), aff'd 2010 WL 3893672 (Sept. 30, 2010)(discussing supervisory liability and the issue of post-incident notification through the grievance procedure).

38.)[8]  I have taken the facts in Tilley's sworn affidavit into consideration in arriving at the

following recommendations. Also, as is demonstrated below, I have reviewed his non-sworn

allegations and arguments.

### General Nature of Tilley's Claims against the Individuals Involved in the Seizure and Search of the Cell Phone

In his response to the summary judgment motions Tilley focuses on the conduct of

Probation Officers Kiefer and Legassie and Police Officer Smith.  He maintains that he is

entitled to relief against these three because his "status as a probationer, standing alone, could

not serve as a substitute for a search warr[a]nt and allow probation officers to search Plaintiff's

cell phones while that initial search was unrelated to the probation." (Nov. 8, 2010 Obj. at 2, Doc

No. 94.)  He maintains that the defendants have failed "to show the existence of any law, legally

authorized regulation, or sentencing order which consented to a general search waiver to

Plaintiff's cell phones for purposes other th[a]n contained within the probation conditions."  (Id.)

He reasons that as no probation violation was found "'but for' the intervention by the police

which derived from probation officers investigative search." (Id. at 3.)   Tilley opines: "That

the search in this case was a[n] arrest incident to a unlawful search, not a search incident to an

arrest." (Id. at 4.)  In his supplemental memorandum Tilley insists that there was no

corroboration to justify the search of his cell phone for drug activity.  (Suppl. Mem. at 1, Doc.

No. 96.) In his supplemental memorandum he seems to be asserting that the phone was taken

from his hand and that this was not a basis for a plain view search to serve a legitimate

probationary goal.  (Id. at 1-2.)  In his sworn affidavit he indicates that Officer Legassie picked

up one of his cell phones from the living room counter.  (Tilley Aff. at 1, Doc. No. 97-1, Page ID

No. 534.)  In this affidavit Tilley seems to be saying that it was not the cell phone Legassie

---

[8]      Tilley also includes Defendant Douglas Smith's answers to his interrogatories in his supplemental pleading.

picked up from the counter that was incriminating but a second phone that he had in his hand when the officers became suspicious of the fact that he had two cell phones and then wanted to see what the incoming text message in the cell phone he was holding said.  (Id. at 2, Page ID No. 535.)

Tilley describes the officers as using this incident as a pretext to uncover evidence of a new crime unrelated to their probationary responsibilities.  (Id. at 2.)[9]

**Defendants Kiefer and Legassie Summary Judgment Facts (Doc. No. 88)**

Ronald Tilley was convicted of criminal charges of aggravated assault and tampering with a witness in Bangor, Maine on January 24, 2006.   He was sentenced to seven years with all but two years, six months suspended and three years of probation.  The conditions of Tilley's probation included: submit to random search and testing for alcohol, drugs, firearms and dangerous weapons; refrain from all criminal conduct; and, answer all reasonable questions by the probation officer and permit the officer to visit his home, place of work or elsewhere.  Tilley was also convicted of escape, terrorizing, eight counts of violation of conditions of release and nine counts of Violation of a Protective Order on the same day.

On February 19, 2008, Tilley was assigned to probation officer, Candice Kiefer. Kiefer is a probation officer for the Maine Department of Corrections, Adult Community Services.  Kiefer has been a probation officer since September of 2000.   As a probation officer, Kiefer supervises adult offenders referred to the Department of Corrections or released to the community, including supervising individuals on probation.  Her duties also include investigating criminal cases and matters concerning probation, arresting and transporting offenders, and conducting

---

[9]      Tilley refers to the "Belton instruction" in support of his argument in an apparent reference to New York v. Belton, 453 U.S. 454 (1981), a case that held: " [W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile,  he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile."  Id. at 460 (footnotes omitted).

routine probation searches of probationers subject to this condition. In 2008, Officer Kiefer worked in the Bangor, Maine office.

Tilley reported only one cellular phone to Officer Kiefer when he was assigned to her. Probationers are required to report all cell phones to their probation officers according to Kiefer and Legassie. On or about July 11, 2008, Ronald Tilley was served with a protective order prohibiting him from having direct or indirect contact with a female juvenile. Tilley informed Probation Officer Kiefer that he had been served with this protective order. After the service of this protective order, Officer Kiefer was contacted by the juvenile's mother who believed Ronald Tilley was having contact with her daughter and was extremely concerned.

On the night of July 22, 2008, Kiefer was conducting routine probation searches with another probation officer, Eric Legassie, an associate of hers in the Bangor office whose duties were similar to Kiefer's. Kiefer considered Tilley at a high risk for violating probation based on his extensive criminal record. Additionally, Tilley had recently moved to a new camper which Kiefer had not yet visited. Kiefer decided to conduct a home check of Tilley's new residence during the course of routine probation visits. Neither Kiefer nor Legassie were requested by the Bangor Police Department or any other law enforcement agency to conduct the probation search and they were not informed of any investigation of Tilley prior to July 22, 2008.

At approximately 9:00 p.m., Officers Kiefer and Legassie approached Tilley's camper located at the Paul Bunyan Campground in Bangor; the camper was small and measured approximately twenty feet long and ten feet wide. Officer Kiefer knocked on the door of the camper and identified who she was and why she was there. Tilley opened the door and allowed them to enter the camper. Once in the camper, Officers Kiefer and Legassie observed two cell phones on the table. Tilley had only reported one cell phone to Officer Kiefer.

In the experience of Officers Kiefer and Legassie, it is common for probationers to purchase a second cell phone without reporting it to their probation officers in order to conduct illegal activity such as drug transactions.  One of the cell phones went off while they were in the camper. Officer Legassie picked up the cell phone and observed numerous text messages both to and from the juvenile who was the subject of the protective order. Two additional messages came in from the juvenile while the officers were in the camper.  Several of the text messages were sexual in nature and caused both Officers Kiefer and Legassie concern.  The text messages indicated that Tilley was having contact with the juvenile in violation of the protective order. Tilley admitted to Officer Kiefer that he texted the juvenile but denied having direct contact with her.

 This conduct constituted new criminal conduct and a probation violation.  Officer Legassie called the Bangor Police Department to report the new criminal charge of Violation of a Protective Order.  Legassie took Tilley into custody for the probation violation and placed him in handcuffs for officer safety and ordered him to remain sitting on the couch.  After this directive, Tilley stood up and stated that he did not have to comply with the orders. Officer Legassie repeated the order to remain seated on the couch.  Tilley refused to sit on the couch despite Probation Officer Legassie's repeated orders to do so. Tilley was becomingly increasingly aggressive.

The size of the camper and Tilley's reaction raised concerns for officer safety. When Tilley failed to comply with his direct orders, Officer Legassie approached him and placed him back into a sitting position on the couch and ordered him again to remain seated as he was in custody for a probation violation.  Officer Kiefer conducted a search of the residence incident to

the arrest and located several items evidencing contact with the female juvenile as well as an inappropriate relationship between Tilley and the female juvenile.

Officer Doug Smith from the Bangor Police Department arrived to investigate the new criminal conduct. Officer Smith reviewed the text messages and took Tilley into custody for the charge of Violation of Protective Order. Officers Kiefer and Legassie believed the review of the text messages on Tilley's cell phone was in the course of a permissible probation search, they observed an unreported cell phone in plain view, and they had information regarding possible contact with the juvenile. Officers Kiefer and Legassie believed it was necessary for Officer Legassie to place Tilley back in a sitting position on the couch as he was refusing to comply with direct orders and was becoming aggressive. The officers did not observe any physical marks or injuries on Tilley at any point on July 22, 2008, and Tilley never complained of any injuries on July 22, 2008. Tilley did not request to see any medical professional for any injuries on July 22, 2008.

On July 24, 2008, Officer Kiefer filed motions to revoke Tilley's probation for his failure to refrain from all criminal conduct, specifically the new charge of Violation of a Protective Order. On August 15, 2008, Tilley admitted the probation violation.

Tilley was sentenced to serve the remaining four years and sixth months of his sentence and his probation was terminated. Tilley filed a state petition for post-conviction review in the Superior Court on December 15, 2008, challenging his new convictions and probation violation.

On January 30, 2009, the Superior Court Judge issued an assignment order in which he did not assign the claim regarding the probation revocation but assigned Tilley's other claims for post-conviction review. The state post-conviction review is still pending, BANSC-CR-2008-01164.

On March 25, 2010, Tilley filed a federal post-conviction review challenging his probation revocation. This 28 U.S.C. § 2254 petition was dismissed without prejudice as the plaintiff failed to exhaust his administrative remedies with regards to the probation revocation claim. The Court found, "Tilley will not be able to challenge the Superior Court's refusal to assign the probation revocation allegations to the docket by requesting review by the Maine Law Court until the entire state post-conviction review proceeding has been completed in the Superior Court."

In this civil rights action Tilley voluntarily dismissed his claims of emotional injury against all defendants. (Doc. Nos. 62 & 68.)

### Defendants Douglas Smith, City of Bangor, and Bangor Police Department Summary Judgment Facts (Doc. No. 86)

Defendants Douglas Smith, the City of Bangor, and the Bangor Police Department fairly summarize Tilley's claims against them in the second amended complaint as follows:

> Plaintiff's claim against Officer Smith in Count III encompasses two and a half pages, though it is simply one long sentence, the purpose of which appears to be listing as many legal principles as possible, including deliberate indifference, discriminatory impact, exigent circumstances, probable cause, due process, etc. Stated as it is, in one sentence of multi-page length, it is fairly incomprehensible. The claim against the City of Bangor and Bangor Police Department, found at Count V, is slightly less incomprehensible, but only because the one sentence making up that entire count is one-half page shorter than the one found in Count III. While making a passing reference to the City's alleged failure to train Officer Smith regarding searches, see Complaint at 11, the remainder of Count V is seemingly based on nothing more than the fact that the City employed Officer Smith on the date in question.

(City Mot. Summ. J. at 3.) In his response to the dispositive motion Tilley indicates that his claim against the City and the Bangor Police Department is one of municipal liability for the decision to enforce the protective order. (Nov. 9, 2010, Obj. at 4.) And his claim against Officer

Smith is for his unlawful entry, search and seizure based on this order and that Smith should have known that it was against his training and clearly established law. (Id. at 4-5.)

These defendants forward the following facts. At all times relevant to the above-referenced matter, Ronald Gastia was employed as the Chief of Police of the City of Bangor Police Department. Gastia is a graduate of the Maine Criminal Justice Academy and is certified as a police officer in the State of Maine by the Maine Criminal Justice Academy. As Chief of Police, Gastia is familiar with liability coverage available to the City of Bangor and its police officers.

Coverage for the City of Bangor and its police officers for liability arising out of their law enforcement duties at the time of the events of July 22, 2008, was provided by the city's membership in the Maine Municipal Association Property & Casualty Pool, a self-insured municipal risk pool. Under the pool agreement, coverage for claims arising under the Maine Tort Claims Act is only available if the entity or the officers do not enjoy immunity under the act for such claims, and the amount of available coverage is governed by the limits of liability contained in the Act. This agreement is the only coverage available to the defendants in the action.

Before any police officer hired by the City of Bangor is allowed to patrol on his or her own, he or she must first graduate from the Maine Criminal Justice Academy and be certified by the State of Maine to perform the duties assigned to a patrol officer. In addition to being certified by the State of Maine as an officer, all new officers must complete a field training program with the Bangor Police Department. The field training program is overseen by supervisory personnel at the Bangor Police Department and includes ongoing reviews of the officer's performance by those supervisors. It is only after the Bangor Police Department field training program is successfully completed that a newly-hired officer may work patrol duties on

12

his or her own. Included in the field training is a review of the Standard Operating Procedures of the Bangor Police Department, including the policies governing searches and seizures.

Chief Gastia is familiar with policies and procedures concerning the lawful use of search and seizure powers and the training given to Bangor police officers in this area. State and federal laws governing searches and seizures, including warrantless arrests, are also taught as part of the curriculum of the basic course at the Maine Criminal Justice Academy. Police officers are also required to complete continuing education every year, as assigned by the state, in order to maintain their certification. Standard Operating Procedures of the Bangor Police Department are also periodically reviewed with all officers. Bangor police officers are trained that a search of a private residence normally requires either a search warrant or exigent circumstances, but that random, warrantless searches may also be authorized by court-ordered conditions of probation.

Warrantless arrests for state criminal offenses, such as that of Tilley by Officer Doug Smith on July 22, 2008, for violation of a protective order, are governed by state law found at 17-A M.R.S. § 15. Bangor police officers are trained in accordance with 17-A M.R.S. §15 both at the Maine Criminal Justice Academy and at the Bangor Police Department. Bangor police officers are taught both at the Maine Criminal Justice Academy and at the Bangor Police Department that arrest without a warrant is lawful under 17-A M.R.S. § 15(A)(13) when the officer has probable cause to believe the arrestee has violated a protective order.

At all times relevant to this matter, Douglas Smith was employed as a police officer by the City of Bangor. Officer Smith graduated from the Maine Criminal Justice Academy in November, 2001, and was certified to work as a police officer by the State of Maine on July 22, 2008. While at the Maine Criminal Justice Academy, Officer Smith received training on the law of search and seizure. As a Bangor police officer, Officer Smith received further training

regarding state and federal law, and Bangor Police Department policies, relating to searches and seizures. Officer Smith completed his field training program with the Bangor Police Department prior to July 22, 2008. Prior to July 22, 2008, Chief Gastia was not made aware of any problems that existed involving Officer Smith and his knowledge of Maine's laws governing searches and/or seizures and had not received any credible information that Officer Smith unlawfully exercised his search or arrest powers, or that there was a demonstrated need for additional training and/or supervision of Officer Smith in those areas. He had no credible information prior to July 22, 2008, indicating that there was any widespread problem with other Bangor police officers concerning the law of searches and seizures.

On July 22, 2008, Officer Smith was dispatched to Paul Bunyon Campground, Lot #14, regarding the violation of a protective order. When Officer Smith arrived at that location and approached the door of the trailer that occupied Lot 14, he was met by Candice Kiefer, known to him as a state probation and parole officer. Probation Officer Kiefer let Officer Smith into the trailer. Upon entry into the trailer, Officer Smith also saw Eric Legassie, another probation and parole officer known to him. Officer Smith also saw Tilley seated on a couch or a bed with his hands behind him, apparently handcuffed. Officer Smith observed that the probation officers were conducting a search of Tilley's trailer. On Officer Smith's arrival, Tilley was not protesting either the search of his trailer or his handcuffing. Officer Smith believed the probation officers had the right to conduct the search of the premises and to detain Tilley while they did so.

Officer Smith was advised by the probation officers that Tilley was on probation following an assault conviction and that the terms of his probation included having to submit to random searches. On July 22, 2008, random, warrantless searches for alcohol, drugs, firearms, and dangerous weapons, were authorized by court ordered conditions of Tilley's probation. The

probation officers further advised Officer Smith that they came to the trailer that night to conduct a search, pursuant to rights granted by the probation order.  The probation officers also told Officer Smith that a protection order had issued from the state court against Tilley on behalf of a minor female.

 Coincidentally, a few weeks prior to July 22, 2008, Officer Smith had been dispatched to Eastern Maine Medical Center after police were called by this minor female's mother when Tilley showed up at the hospital where she had taken her daughter.  At the mother's request, Officer Smith escorted Tilley away from the minor female and her mother.  In speaking with the minor female's mother after Tilley had left, she advised Officer Smith that she would be going to court to get a protection order preventing any contact between Tilley and her daughter. Because of Officer Smith's personal involvement in that incident at the hospital, he was aware of the background behind the issuance of the protective order against Tilley.   The probation officers advised Officer Smith that the protective order prohibited any contact, direct or indirect, between Tilley and the minor female.   Officer Smith then confirmed the conditions of the protective order and the date of service on Tilley through dispatch.  Prior to Officer Smith's arrival, the probation officers had found cell phones in Tilley's trailer, not all of which had been reported to them as required by his probation officer.

 The probation officers told Officer Smith that they typically searched cell phones because probationers commonly get additional cell phones specifically for the purpose of using them for drug transactions, and information concerning such drug transactions is often found when they search the cell phones. In searching Tilley's cell phone, the probation officers discovered text messages between Tilley and the minor female that occurred subsequent to the date the protective order issued, prohibiting contact between them.  The probation officers also told

Officer Smith that some of the messages had disturbing sexual content, and that Tilley had admitted having this contact via cell phone in violation of the protective order.

As Officer Smith was speaking to the probation officers, Tilley spontaneously admitted that he had been texting with the minor female subsequent to being served with the protective order prohibiting any contact between them. Tilley made this initial admission on his own and not as a result of any questioning by Officer Smith. The probation officers showed Officer Smith some of the text messages and then handed him the cell phone so that Officer Smith could confirm what they had reportedly seen. Officer Smith skimmed through some of the text messages between Tilley and the minor. Tilley's cell phone contained approximately 600 saved messages between Tilley and the minor after the protective order prohibiting any contact between them had been served on Tilley. Officer Smith was quickly able to confirm the disturbing sexual content of the messages that the probation officers had reported to him.

Officer Smith read Tilley his Miranda rights. Tilley indicated to Officer Smith that he understood his rights and would answer some questions. In response to Officer Smith's questions, Tilley admitted being served with the protective order and that he had obtained new cell phones for him and the minor so they could continue to have contact with each other despite the protective order prohibiting such contact. Officer Smith was also advised by the probation officers that they had located a diary whose entries referred to other contact between Tilley and the minor female after the date of service of the protective order, as well as a photograph of the two of them kissing.

Because of the evidence of numerous violations of the protective order prohibiting contact between Tilley and the minor female, Officer Smith advised Tilley that he was placing him under arrest for violation of the order. At that point, the probation officers advised Officer

Smith that they were placing a probation hold on Tilley as a result of his criminal conduct and that they would transport him to Penobscot County Jail.

Because Tilley was already in handcuffs when Officer Smith arrived, and remained so throughout the time Officer Smith was there, Officer Smith did not take any steps himself to physically take Tilley into custody. Smith seized two cell phones, phone chargers, the diary, and photographs of plaintiff and the minor female as evidence for the charge of violating the protective order. Those materials have now been returned to Tilley.

On August 15, 2008, Tilley pled guilty in Penobscot County Superior Court to the charge of violating the protective order and was sentenced to 364 days in the Penobscot County Jail. Prior to being served a copy of Tilley's second amended complaint in March 2010, the City of Bangor, the Bangor Police Department, and Officer Smith never received a notice of claim from Ronald Tilley indicating that he was making claims against them arising out of the events of July 22, 2008, as required by the Maine Tort Claims Act. The service of the second amended complaint was the first indication the City of Bangor, the Bangor Police Department, and Officer Smith had that Tilley was making any claims arising out of the events of July 22, 2008.

**The constitutional claims, qualified immunity and the individual defendants**

The United States Supreme Court has acknowledged that sometimes it is appropriate for lower courts to *not* expend substantial judicial resources attempting to limn the contours of difficult constitutional issues in the context of specific Section 1983 complaints. See generally Pearson v. Callahan, 555 U.S. 223 (2009). I conclude that determining the outer parameters of a probation officer's authority to conduct a warrantless search under the facts of this case would be one such exercise. "Officials are entitled to qualified immunity unless (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right and (2) the right at

issue was 'clearly established' at the time of [the defendants'] alleged misconduct." <u>Melendez-Garcia v. Sanchez</u>, __ F.3d __, __, 2010 WL 5027560, 6 (1st Cir. Dec. 10, 2010) (internal quotations omitted) (quoting <u>Walden v. City of Providence</u>, 596 F.3d 38, 52(1st Cir. 2010) which was quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, __, 129 S.Ct 808, 816 (2009)). As in <u>Melendez-Garcia</u>, this case is best reviewed by addressing the second prong of the qualified immunity test first. <u>See</u> <u>id.</u>

> "This second prong has 'two aspects'":
>
> (1) "whether, based on the 'clarity of the law at the time of the alleged civil rights violation,' ' "[t]he contours of the right ... [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right," ' " <u>Walden</u>, 596 F.3d at 52 (alteration in original) (quoting <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 269 (1st Cir.2009) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987))), and (2) "whether, based on the 'facts of the particular case,' a 'reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.'" <u>Id.</u> (quoting <u>Maldonado</u>, 568 F.3d at 269). The " 'relevant, dispositive inquiry' " in determining whether a right was "clearly established" is " 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " <u>Id.</u> at 53 (quoting <u>Saucier [v. Katz,]</u>, 533 U.S. [194,] 201[(2011)]).

<u>Id.</u>

**Probation Officers Kiefer and Legassie**

The question of whether or not Officers Kiefer and Legassie are entitled to judgment at this point of the litigation on the constitutional claims turns on whether or not they are entitled to qualified immunity for engaging in a warrantless search of Tilley's cell phone after it was seized from him. Probationers "do not enjoy 'the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special [probation] restrictions.'" <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 874 (1987) (quoting <u>Morrissey v. Brewer</u>, 408 U.S. 471, 480 (1972) and affirming search of probationer's home conducted pursuant to established Wisconsin regulation). <u>United States v. Knights</u>, 534 U.S. 112 (2001) held that the warrantless search of a

probationer, "supported by reasonable suspicion <u>and authorized by a condition of probation</u>, was reasonable within the meaning of the Fourth Amendment. 534 U.S. at 122. Tilley's conditions of probation do not include any provision for a generalized search or expressly limit him to one cell phone. <u>See</u> <u>Bates v. Harvey</u>, 518 F.3d 1233, 1243 n. 11 (11th Cir. 2008). On the one hand, Tilley has not contested that Kiefer informed him that as his probation officer she wanted him to report a phone acquired after the commencement of his probationary period. On the other hand, Tilley has included a representation in his unsworn affidavit that he did notify Kiefer that he had a second cell phone on a voice mail message left for her and that at the time of the search Officer Kiefer indicated that she knew that he had a second cell phone number. (Doc. No. 97-1, Page ID No. 535.) This factual dispute, even if it had been properly generated in the summary judgment record, is not material to the qualified immunity analysis because it is undisputed that Tilley had two cell phones and that the officers' suspicions were aroused because they saw both cell phones in plain view.

Following the guidance of <u>Samson v. California</u>, 547 U.S. 843 (2006) (warrantless, suspicionless search of a parolee pursuant to a consented to condition of release), <u>Knights</u> (warrantless search of a probationer pursuant to authorized condition of probation), <u>Griffin</u>, and the First Circuit's <u>United States v. Graham</u>, 553 F.3d 6, 18 (1st Cir. 2009), I reach the conclusion on the summary judgment record as it stands that Defendants Kiefer and Legassie are entitled to qualified immunity. Because <u>Graham</u> provides a very thorough analysis of the relevant Supreme Court and First Circuit law relating to Fourth Amendment challenges brought by a probationer subject to a warrantless search, it is unnecessary for me to provide a separate summary of those Supreme Court precedents to make the qualified immunity determination.[10]

---

[10]     I add only that it is evident from the split decisions in <u>Sampson</u> and <u>Griffin</u>, that there is considerable room for debate in this area of Fourth Amendment jurisprudence. <u>Griffin</u> is a 1987 case and would necessarily

In <u>Graham</u> the defendant was challenging the denial of a motion to suppress in his criminal proceedings.  At the time of the search, Graham was on probation for various state drug offenses and he failed to report as required by the terms of his probation.  553 F.3d at 9.  Police officers went to an apartment where Graham was located.  <u>Id.</u> at 10. There was an arrest warrant but no search warrant.  After the arrest, the police contacted a probation officer and when he arrived at the apartment "the probation officer asked the officers to search the bedroom where Graham was found. In the course of this search, the police found a sawed off shotgun and ammunition in the drawer of a dresser. The officers also discovered a small safe underneath the bed. Using a knife, an officer opened the safe and discovered various types of ammunition."  <u>Id.</u> at 11.[11]

Citing <u>Griffin,</u>  <u>Knights</u>, and <u>Sampson</u>, <u>Virginia v. Moore</u>, 553 U.S. 164 (2008),  as well as  First Circuit precedents including <u>United States v. Weikert</u>, 504 F.3d 1 (1st Cir. 2007), the <u>Graham</u> Panel reasoned:

> Certain relevant principles are well established. To be valid under the Fourth Amendment, a search must be "reasonable." <u>Knights</u>, 534 U.S. at 119 ("The touchstone of the Fourth Amendment is reasonableness"). Typically, to be considered reasonable a search of a home must be supported by probable cause and be executed pursuant to a particularized warrant authorizing the search. <u>See</u>

_____

inform the clearly established analysis of the law pertaining to searches of a probationer's home such as this one.

In <u>Sampson</u> the majority explained that the Supreme Court granted certiorari, "to answer a variation of the question this Court left open in" <u>Knights</u>, "whether a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment."  547 U.S. at 847 (footnote omitted).  The majority answered this question in the affirmative, but Justice Stevens wrote a dissent joined by Justices Souter and Breyer. <u>Id.</u> at 857- 66.  Although for purposes of this case it is unnecessary to discuss <u>Sampson</u> at length, it is of some relevance to the defendants' assertion of qualified immunity because as of 2006 the justices were still discussing and disagreeing on the reach of <u>Griffin</u> and <u>Knights</u> with respect to Fourth Amendment principles as applicable to "released prisoners"  -- i.e., parolees and probationers .

[11]        There are numerous points of distinction between <u>Graham</u> and Tilley's, such as the particular probation conditions signed by the probationers and the fact that the police verses probation were the first to enter the premises and notice the potential that the probationer may have engaged in new criminal activity.  These contrasts need not be fully set forth in order to make the second-prong qualified immunity determination.

Weikert, 504 F.3d at 6; United States v. Curzi, 867 F.2d 36, 41 (1st Cir.1989)
("warrantless searches of a dwelling-place are presumptively unreasonable").
However, there are exceptions to the probable cause and warrant requirements, as
the reasonableness of any search is ultimately determined by examining the
"totality of the circumstances" and balancing on one hand "the degree to which
[the search] intrudes upon an individual's privacy" and on the other "the degree to
which [the search] is needed for the promotion of legitimate government
interests." Knights, 534 U.S. at 118-19.

553 F.3d at 15.

As relevant to the facts of Tilley's case, the First Circuit then concluded that when the

police possess reasonable suspicion that a probationer is violating the terms of probation, the

Fourth Amendment does not require the police to secure a search warrant before executing a

probation search. Id. at 18.   Noting that the "district court suggested that the police could have

conducted a valid probation search even absent any suspicion that Graham had violated the terms

of his probation order," it observed that the court's conclusion that there was ample evidence that

the officers had reasonable suspicion had not been challenged, and so it left for another day the

answer to the question of "whether a suspicionless search would offend the Fourth Amendment."

Id. at 7 n. 18.[12]

The First Circuit decided Graham on January 9, 2009, well after the search in this case

and obviously considered the legal question unresolved enough to be worthy of careful

consideration.  With the probation officers addressing the discovery of the second cell phone on

July 22, 2008, the contours of the Fourth Amendment right based on the facts confronted by

---

[12]        In view of the Pearson directive that it is not necessary for the district court to decide hard questions posed
by the first prong of the qualified immunity standard, it is unnecessary to decide in this case whether or not
these two probation officers had a suspicion sufficient to justify their decision to view the text messages.  It is
Tilley's assertion that this visit by the two probation officers was triggered only by a tip that Kiefer received about
his alleged contact with the minor subject of the protection order.  (Tilley Aff. at 1, Doc. No. 97-1, Page ID No.
534.)  It is my conclusion that at the time of the search there simply was not clearly established law that would alert
reasonable officers given the particular facts of this case that they could not search the cell phone without a warrant.

Kiefer and Legassie were not sufficiently clear so that a reasonable officer would know that the seizure of the cell phone and the immediate review of the text messages was unlawful.

**Bangor Police Officer Smith**

It is safe to say based on this record that Officer Smith did not violate Tilley's Fourth Amendment rights. As earlier summarized Tilley makes it clear that his claim against Smith is for his unlawful entry, search, and seizure based on the protective order. Tilley has created no genuine dispute of fact that there was any illegality in the protection order and he really has not even explained his theory of how this protective order was somehow unenforceable. The facts as left uncontested demonstrate that upon being notified about the protective order by the probation officers Smith double checked to make sure that it was indeed so before proceeding to arrest Tilley for the new criminal conduct.

With regards to Smith's participation in the warrantless search, there is no genuine dispute that Officer Smith was relying on the information provided by the two probation officers in responding to the scene and undertaking his cursory search of the cell phone and subsequent seizure of the other materials found by the probation officers. "Reasonable law enforcement officers may rely without investigation on information from a trustworthy source." Scallion v. Norman, 251 Fed.Appx. 853, 855, 2007 WL 2326154, 2 (5th Cir. Aug. 15, 2007). The majority concluded in Griffin that it is "reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support a probationer search." 483 U.S. at 879-80 (footnote omitted). In this case certainly the converse is true. It was reasonable for Smith, the police officer, to rely upon information provided to him by the probation officers in order to formulate his probable cause for the arrest and the plain view seizure of the materials provided to him by those officers. In my view Smith did not commit any Fourth Amendment violation.

I think it is unnecessary to go beyond this conclusion, but with respect to Smith's entitlement to qualified immunity, I have just concluded that even if Kiefer and Legassie committed a constitutional violation by conducting a warrantless search for evidence of new criminal conduct, they are entitled to qualified immunity under this set of facts. Obviously Smith, one step further removed from the alleged rights violation, would be entitled to qualified immunity as well.

### City of Bangor and the Bangor Police Department

As I have concluded that there was no constitutional violation by Officer Smith this obviates the need to discuss the liability of the City of Bangor and the Bangor Police Department for Tilley's constitutional claims. See Wilson v. Town of Mendon, 294 F.3d 1, 6 -7 (1st Cir. 2002). Once again, Tilley has simply failed to present this court with evidence that there was anything illegal about the protective order or the decision to enforce this order. It is also worth noting that even if Tilley did demonstrate that Smith violated his rights by enforcing the order, Tilley expressly states that this alleged injustice was against Smith's training and clearly established law. This concession entirely undercuts any failure to train/unconstitutional custom or policy theory of municipal liability.

### The Maine Tort Claims Act claims against the Summary Judgment Movants

With regards to Tilley's Maine Tort Claims Act claims against the Bangor Police Department, the City of Bangor, and Officer Smith, there is no dispute that Tilley never filed a notice of claim, a necessary prerequisite to proceeding with claims under that act. See 14 M.R.S. 8107. With regards to Officer Legassie, Tilley's second amended complaint asserts claims of negligent infliction of emotional distress, false arrest, false imprisonment, and assault and battery. (Am. Compl. at 4 5.) His count against Kiefer only references the negligent infliction of

emotional distress tort. (Id. at 3.) Tilley has in no way defended his state tort claims in his responsive memoranda. He has not countered the interpretation of the defendants that he has withdrawn his claim of intentional emotional distress at Docket No. 68. While not necessarily premising my recommendation on Tilley's waiver of the non-emotional distress claims in responding to the summary judgment motions, I do consider the defendants' unopposed arguments concerning their non-susceptibility to suit under the Maine Tort Claims Act in their summary judgment motion legally sound and as presenting an adequate showing of their entitlement to judgment on the state law claims.

### Tilley's Motion to Show Cause, Motion to Stay, Motion to Appoint Counsel, and Objected-to Request for an Evidentiary Hearing (Doc. Nos. 90, 99, 106, 107)

As I earlier indicated, I deny Tilley's motion to show cause, his motion to stay, his motion for appointment of counsel, and his request for an evidentiary hearing.

With respect to the motion to show cause the denial is outright. Tilley's motion to show cause relates to two cell phones, their chargers, and a black spiral notebook. The motion is directed at Defendant Smith. Defendant Smith has filed an objection to this motion that is basically a showing of cause in that it credibly represents that the materials were returned in accordance with Tilley's requested return directive. In his pleading docketed at Number 107, Tilley complains that his requests for the return of the property was not handled expeditiously enough by Smith's attorney and characterizes Smith's show-cause filings with the court as somehow deceptive because he was not previously provided with the documentation now on record with the court. (See Page ID No. 577.) However, the record before the court is that these items have been returned per Tilley's instruction and there is no possible benefit to Tilley in ordering any further action by Smith vis-à-vis the property concerned.

In his motion to stay Tilley requests that this court put this civil action in stowage until he is able to complete his post-conviction proceedings. This is a request that is tethered to the <u>Heck</u> concern and my recommendation on the dispositive motions is premised on my determination that the merits of the claims can be adjudicated without the necessity of plowing <u>Heck</u>'s rutted furrows. Accordingly, I now deny Tilley's current request to stay. With regards to the motion to stay, should the court disagree with my analysis that the three dispositive motions should be granted in defendants' favor, Tilley would then be permitted to renew his motion to stay if he so desired.

As to Tilley's motion seeking court-secured counsel, at this stage of the proceeding Tilley's case does not present the type of extraordinary circumstances that would warrant a court negotiated appointment of counsel. <u>See</u> <u>DesRosiers v. Moran</u>, 949 F.2d 15, 23 (1st Cir. 1991); <u>Clarke v. Blais</u>, 473 F. Supp. 2d 124 (D. Me. 2007). Finally, I deny Tilley's request for an evidentiary hearing. The District of Maine Local Rules certainly do not contemplate such recourse as a way to challenge dispositive motions and Tilley's action does not present the type of extraordinary circumstance that might justify the court entertaining such a irregular request.

## Conclusion

Based on the above discussion I recommend that the Court grant judgment in favor of the defendants on their three dispositive motions and the court deny Tilley's motion to dismiss without prejudice. I deny Tilley's motions to stay, to show cause and various other motions requesting evidentiary and/or other relief.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 30, 2010